UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ALABA OLUYOMI,                                          :

                                                        :          OPINION AND ORDER

                        Plaintiff,

                                                        :          09 Civ. 9171 (GWG)
          -v.-                                                     09 Civ. 10293 (GWG)

                                                        :

JANET NAPOLITANO, et al.,                               :

                        Defendants.                     :
-----------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Alaba Oluyomi, proceeding pro se, brings these actions pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17 ("Title VII"), alleging that defendants

Janet Napolitano, Secretary of Homeland Security, and the United States Citizenship and

Immigration Services (collectively, the "Government"), discriminated against him on the basis

of his race, color, and national origin.  The parties consented to have this matter decided by a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Oluyomi and the Government

have each moved for summary judgment as to both of the actions.  For the reasons discussed

below, Oluyomi's motions for summary judgment are denied and the Government's motions for

summary judgment are granted.

I.        BACKGROUND

          A.        The Instant Proceedings

        Oluyomi commenced these actions through two separate complaints, one filed on

November 4, 2009, and the other filed on December 18, 2009, alleging discrimination on the

basis of race, color, and national origin under Title VII.  See Complaint for Employment

Discrimination, filed Nov. 4, 2009 (Docket # 1 in 09 Civ. 9171 ) ("9171 Compl."); Complaint

for Employment Discrimination, filed Dec. 18, 2009 (Docket # 1 in 09 Civ. 10293) ("10293 Compl."). In the 09 Civ. 9171 complaint, Oluyomi claims failure to promote and "disregard of veterans' preference right." 9171 Compl. at 2-3. In the 09 Civ. 10293 complaint, he challenges two incidents of discipline, alleging they are the result of discrimination and retaliation for his prior EEO activity. See 10293 Compl. at 3.

On March 10, 2011, Oluyomi filed a motion for summary judgment as to his two actions against the Government.[1] On March 15, 2011, the Government moved for summary judgment with regard to both of the actions pursuant to Fed. R. Civ. P. 56, and opposed Oluyomi's motion.[2] Also on March 15, 2011, the Court denied Oluyomi's motion because it did not contain

---

[1] Plaintiff's Motion for Summary Judgment, filed Mar. 10, 2011 (Docket # 34 in 09 Civ. 9171) (Docket # 31 in 09 Civ. 10293) ("Pl. Motion").

[2] Notice of Motion, filed Mar. 15, 2011 (Docket # 36 in 09 Civ. 9171); Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed Mar. 15, 2011 (Docket # 37 in 09 Civ. 9171); Declaration of Andrea Quarantillo, filed Mar. 15, 2011 (Docket # 38 in 09 Civ. 9171) ("Quarantillo Decl. 9171"); Declaration of Susan U. Clark, filed Mar. 15, 2011 (Docket # 39 in 09 Civ. 9171) ("Clark Decl."); Declaration of James Nicholas Boeving, filed Mar. 15, 2011 (Docket # 40 in 09 Civ. 9171) ("Boeving Decl. 9171"); Declaration of Dennis Bunce, filed Mar. 15, 2011 (Docket # 41 in 09 Civ. 9171) ("Bunce Decl. 9171"); Declaration of John T. Ryan, filed Mar. 15, 2011 (Docket # 42 in 09 Civ. 9171) ("Ryan Decl."); Declaration of Stephen Rosina, filed Mar. 15, 2011 (Docket # 43 in 09 Civ. 9171) ("Rosina Decl."); Declaration of Ronald Mark Phillips, filed Mar. 15, 2011 (Docket # 44 in 09 Civ. 9171) ("Phillips Decl."); Declaration of Laura Dawkins, filed Mar. 15, 2011 (Docket # 45 in 09 Civ. 9171) ("Dawkins Decl."); Declaration of Pearl Chang, filed Mar. 15, 2011 (Docket # 46 in 09 Civ. 9171) ("Chang Decl."); Declaration of Michael Valverde, filed Mar. 15, 2011 (Docket # 47 in 09 Civ. 9171) ("Valverde Decl."); Declaration of Enrica M. Troy, filed Mar. 15, 2011 (Docket # 48 in 09 Civ. 9171) ("Troy Decl. 9171"); "Defendants' Statement of Undisputed Material Facts Pusuant [sic] to Local Rule 56.1," filed Mar. 15, 2011 (Docket # 49 in 09 Civ. 9171) ("Def. 56.1 Stat. 9171"); Notice to Pro Se Litigant Pursuant to Local Civil Rule 56.2, filed Mar. 15, 2011 (Docket # 50 in 09 Civ. 9171); Notice of Motion, filed Mar. 15, 2011 (Docket # 32 in 09 Civ. 10293); Declaration of Dennis Bunce, filed Mar. 15, 2011 (Docket # 33 in 09 Civ. 10293) ("Bunce Decl. 10293"); Declaration of Viviane Haddad, filed Mar. 15, 2011 (Docket # 34 in 09 Civ. 10293) ("Haddad Decl."); Declaration of Enrica M. Troy, filed Mar. 15, 2011 (Docket # 35 in 09 Civ. 10293) ("Troy Decl. 10293"); Declaration of Scott Ruben, filed Mar. 15, 2011 (Docket # 36 in 09 Civ. 10293) ("Ruben Decl."); Declaration of Andrea Quarantillo, filed Mar. 15, 2011 (Docket

the statement required by Local Civil Rule 56.1 and because it was unaccompanied by any affidavits or declarations attesting to the authenticity of the documents upon which the motion relied.  See Order, filed Mar. 15, 2011 (Docket # 35 in 09 Civ. 9171) (Docket # 40 in 09 Civ. 10293).  The Court, however, gave Oluyomi leave to re-submit a motion for summary judgment as a "cross-motion" to the Government's motion and without refiling the motion or exhibits.  Id. The Court noted that Oluyomi would need to submit the statement required by Local Civil Rule 56.1 and, if he wished the exhibits to be considered, a declaration or affidavit attesting to their authenticity.  Id.  Oluyomi subsequently re-submitted his motion for summary judgment, curing the defects of his previous motion.[3]

---

# 37 in 09 Civ. 10293) ("Quarantillo Decl. 10293"); Declaration of James Nicholas Boeving, filed Mar. 15, 2011 (Docket # 38 in 09 Civ. 10293) ("Boeving Decl. 10293"); Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed Mar. 15, 2011 (Docket # 39 in 09 Civ. 10293); "Defendants' Statement of Undisputed Material Facts Pusuant [sic] to Local Civil Rule 56.1," filed Mar. 15, 2011 (Docket # 41 in 09 Civ. 10293) ("Def. 56.1 Stat. 10293"); Notice to Pro Se Litigant Pursuant to Local Civil Rule 56.2, filed Mar. 15, 2011 (Docket # 42 in 09 Civ. 10293); Plaintiff's Opposition to the Defendants' Motion for Summary Judgment, filed Apr. 14, 2011 (Docket # 53 in 09 Civ. 9171) ("Pl. Opp."); Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment & Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment, filed May 13, 2011 (Docket # 55 in 09 Civ. 9171) ("Def. Reply 9171"); Defendants' Response to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed May 13, 2011 (Docket # 56 in 09 Civ. 9171) ("Def. 56.1 Stat. Resp. 9171"); Second Declaration of James Nicholas Boeving, filed May 13, 2011 (Docket # 57 in 09 Civ. 9171); Second Declaration of James Nicholas Boeving, filed May 13, 2011 (Docket # 45 in 09 Civ. 10293)  ("Boeving Second Decl."); Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment & Memorandum of Law in Opposition to Plaintiffs' Cross-Motion for Summary Judgment, filed May 13, 2011 (Docket # 46 in 09 Civ. 10293); "Defendants' Response to Plaintiff's Statement of Undisputed Material Facts Pusuant [sic] to Local Rule 56.1," filed May 13, 2011 (Docket # 47 in 09 Civ. 10293).

[3]  Letter from Oluyomi to Hon. Gabriel W. Gorenstein, filed Apr. 14, 2011 (Docket # 52 in 09 Civ. 9171); Declaration of Alaba Oluyomi, dated Apr. 14, 2011 (Docket # 51 in 09 Civ 10293) ("Oluyomi Decl."); Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1, dated Apr. 14, 2011 (Docket # 52 in 09 Civ. 10293) ("Pl. 56.1 Stat."); Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment & Memorandum of Law in Opposition to

B.     Evidence Presented on the Summary Judgment Motions

Oluyomi "is an African-American male of Nigerian ancestry."  See Def. 56.1 Stat. 9171

¶ 1; Pl. Opp. at 2 ¶ 1.  Oluyomi began his employment at the Department of Homeland Security

("DHS") as an inspection officer in Atlanta, Georgia.  See Def. 56.1 Stat. 9171 ¶ 1; Pl. Opp. at 2

¶ 1; Boeving Decl. 9171 ¶ 3; Depositon of Alaba Oluyomi, dated Nov. 30, 2010 (annexed as Ex.

B to Boeving Decl. 9171) ("Oluyomi Dep. 9171") at 27.

1.     Facts Relating to Claims Raised in 09 Civ. 9171

a.     Background Facts

In 2004, Oluyomi became an adjudication officer in the New York Field Office of DHS.

See Def. 56.1 Stat. 9171 ¶ 5; Pl. Opp. at 2 ¶ 5; Oluyomi Dep. 9171 at 28.  Between 2004 and

2006 he worked in the "Adjustment of Status Unit."  See Def. 56.1 Stat. 9171 ¶ 6; Pl. Opp. at 2

¶ 6; Oluyomi Dep. 9171 at 29, 53.  For two to three months after this assignment, he was

detailed to the "Legalization Unit."  See Def. 56.1 Stat. 9171 ¶ 7; Pl. Opp. at 2 ¶ 7; Oluyomi Tr.

at 33.  Thereafter, Oluyomi went on detail to the "NTA Unit" for approximately one year.  See

Def. 56.1 Stat. 9171 ¶ 8; Pl. Opp. at 2 ¶ 8; Oluyomi Dep. 9171 at 29-30.  In 2007, following the

conclusion of this detail, he was assigned to the "Naturalization Unit."  See Def. 56.1 Stat. 9171

¶ 9; Pl. Opp. at 3 ¶ 9; Oluyomi Dep. 9171 at 30, 53.  Oluyomi has never managed employees at

DHS.  See Def. 56.1 Stat. 9171 ¶ 10; Pl. Opp. at 3 ¶ 10; Oluyomi Dep. 9171 at 136-37.

Oluyomi received an undergraduate degree in computer science from Ogun State

University in Nigeria.  His undergraduate studies did not include any courses in the areas of

immigration law or policy.  See Def. 56.1 Stat. 9171 ¶¶ 11-12; Pl. Opp. at 3 ¶¶ 11-12; Oluyomi

_____

Defendants' Motion for Summary Judgment, filed June 9, 2011 (Docket # 59 in 09 Civ. 9171)
(Docket # 50 in 09 Civ. 10293) ("Pl. Mem.").

4

Dep. 9171 at 9, 11-13.  Oluyomi also has a Master's degree in computer science from the University of Maryland.  His studies at the University of Maryland did not include any course work in the areas of immigration law or policy.  See Def. 56.1 Stat. 9171 ¶¶ 13-14; Pl. Opp. at 3 ¶¶ 13-14; Oluyomi Dep. 9171 at 13-14.  Oluyomi recently completed an online Ph.D. program at Walden University, focusing on applied management and decision sciences.  These studies also did not include any courses on immigration law or policy.  See Def. 56.1 Stat. 9171 ¶¶ 15-16; Pl. Opp. at 3 ¶¶ 15-16; Oluyomi Dep. 9171 at 14-17, 19-22.

### b.    Vacancy Announcement CIS-137951-BUR

Vacancy Announcement CIS-137951-BUR announced an opening for the position of "Senior Adjudication Officer (Temporary)."  See Def. 56.1 Stat. 9171 ¶ 17; Pl. 56.1 Stat. ¶ 2; Pl. Opp. at 3 ¶ 17.  The position required, inter alia, the abilities to analyze and implement immigration law and policy, to act as a liaison between the New York field office and DHS headquarters in Washington, D.C., to conduct research and provide recommendations on cases, and to provide training to other DHS employees.  See Def. 56.1 Stat. 9171 ¶ 18; Pl. Opp. at 3 ¶ 18; Senior Adjudication Officer (Temporary) (annexed as Ex. C to Boeving Decl. 9171); Position Description (annexed as Ex. D to Boeving Decl. 9171); Ryan Decl. ¶ 3; Troy Decl. 9171 ¶ 2; Bunce Decl. 9171 ¶ 2; Rosina Decl. ¶ 2.

The position was announced in accordance with the "Merit Promotion procedures," and thus selections were made according to the "Tri-Bureau Merit Promotion Plan."  See Def. 56.1 Stat. 9171 ¶ 19; Pl. Opp. at 3 ¶ 19; Clark Decl. ¶ 6; U.S. Customs and Border Protection (annexed as Ex. K to Clark Decl.) ("U.S. Customs and Border Protection").  Pursuant to the Merit Promotion Plan, the selecting officials considered, inter alia, answers to job-related questions, narrative responses, and structured interviews.  See U.S. Customs and Border

Protection § 5.7; see Def. 56.1 Stat. 9171 ¶ 20; Pl. Opp. at 4 ¶ 20.  "Because the individuals selected for the position would train other adjudication[] officers and interact with the public, their communication and interpersonal skills were critical."  Ryan Decl. ¶ 4; See Def. 56.1 Stat. 9171 ¶ 22; Pl. Opp. at 4 ¶ 22.  Oluyomi applied to this position by submitting a résumé and narrative responses to required questions.  See Def. 56.1 Stat. 9171 ¶ 23; Pl. Opp. at 4 ¶ 23; Oluyomi Dep. 9171 at 63, 81.  Twenty-nine individuals, including Oluyomi, were certified as eligible for this position.  See Def. 56.1 Stat. 9171 ¶ 24; Pl. Opp. at 4 ¶ 24; Clark Decl. ¶¶ 3-4; Burlington Service Center Merit Promotion Certificate of Eligibles Control Sheet (annexed as Ex. I to Clark Decl.) ("Burlington Service Ctr. Merit Promotion Certificate").

Six individuals were on a recommending panel that interviewed candidates and made recommendations to the selecting official: Dennis Bunce (Section Chief of the Naturalization Unit), Enrica Troy (Site Manager in the Naturalization Unit), John Ryan (Section Chief of the Adjudications 2 Unit and acting supervisor of the other section chiefs), James Tu (Section Chief of the Adjudications 3 Unit), Steve Rosina (Section Chief of the Adjustment of Status Unit), and Sue Young (Site Manager in the Adjustment of Status Unit).  See Def. 56.1 Stat. 9171 ¶¶ 27-33; Pl. Opp. at 4-5 ¶¶ 27-33; Ryan Decl. ¶¶ 6-9; Troy Decl. 9171 ¶¶ 4-5; Bunce Decl. 9171 ¶¶ 4-5; Rosina Decl. ¶¶ 4-5.  The selecting official, Field Office Director Gwynne MacPherson, had been delegated that responsibility by District Director Andrea Quarantillio.  See Def. 56.1 Stat. 9171 ¶ 34; Pl. Opp. at 5 ¶ 34; Quarantillo Decl. 9171 ¶¶ 3-4.  Quarantillo played no role in the selections for this vacancy.  See Def. 56.1 Stat. 9171 ¶ 35; Pl. Opp. at 5 ¶ 35; Quarantillo Decl. 9171 ¶ 3.

Ryan was in charge of coordinating the hiring process for Senior Adjudication Officers under this vacancy.  See Def. 56.1 Stat. 9171 ¶ 36; Pl. Opp. at 5 ¶ 36; Ryan Decl. ¶ 8.  He

divided the six panel members into three teams of two in order to conduct interviews.  The teams consisted of: (1) Bunce and Troy, (2) Ryan and Tu, and (3) Rosina and Young.  See Def. 56.1 Stat. 9171 ¶ 37; Pl. Opp. at 5 ¶ 37; Ryan Decl. ¶ 9.  Candidates were interviewed by a team that did not include anyone who was the candidate's current or former permanent supervisor.  See Def. 56.1 Stat. 9171 ¶ 38, Pl. Opp. at 5 ¶ 38; Ryan Decl. ¶ 8.  Each candidate was asked the same questions during the interview.  See Def. 56.1 Stat. 9171 ¶ 39; Pl. Opp. at 6 ¶ 39; Ryan Decl. ¶ 8; Troy Decl. 9171 ¶ 5; Bunce Decl. 9171 ¶ 5.  After interviewing candidates, the panel members discussed the interviews together, informed the panel of their strongest candidates, and solicited feedback from other panel members regarding these candidates, including those members who had acted as the candidate's current or former supervisors.  See Def. 56.1 Stat. 9171 ¶ 40; Pl. Opp. at 6 ¶ 40; Ryan Decl. ¶¶ 8, 17; Troy Decl. 9171 ¶ 5; Bunce Decl. 9171 ¶¶ 5, 10; Rosina Decl. ¶ 12.  Rosina had previously served as Oluyomi's second line supervisor.  See Def. 56.1 Stat. 9171 ¶ 41; Pl. Opp. at 6 ¶ 41; Oluyomi Dep. 9171 at 156-57.  At the time of Oluyomi's interview, Tu was his second line supervisor.  See Def. 56.1 Stat. 9171 ¶ 42; Pl. Opp. at 6 ¶ 42; Oluyomi Dep. 9171 at 156-57.

Oluyomi interviewed for this vacancy with Bunce and Troy.  See Def. 56.1 Stat. 9171 ¶ 43; Pl. Opp. at 6 ¶ 43; Troy Decl. 9171 ¶ 7; Bunce Decl. 9171 ¶ 7.  The interviewers ended Oluyomi's interview prematurely and he was called back later on the same day to complete the interview.  See Def. 56.1 Stat. 9171 ¶ 44; Pl. Opp. at 6 ¶ 44; Troy Decl. 9171 ¶ 7.  Bunce and Troy did not recommend Oluyomi to the panel members.  See Def. 56.1 Stat. 9171 ¶ 45; Pl. Opp. at 6 ¶ 45; Troy Decl. 9171 ¶ 10; Bunce Decl. 9171 ¶ 8.

Ryan and Tu interviewed and recommended (1) Patricia White, (2) Jane Sphatt, (3) Jessica Clarke, and (4) Veronica Yip.  See Def. 56.1 Stat. 9171 ¶ 54; Pl. Opp. at 10 ¶ 54; Ryan

7

Decl. ¶ 12.  Tu and Ryan, unlike the other interviewers, assigned a numerical score to each candidate.  The four individuals they recommended were the candidates with the highest assigned scores.  See Def. 56.1 Stat. 9171 ¶ 55; Pl. Opp. at 10 ¶ 55; Ryan Decl. ¶¶ 10, 12.  White, an African-American, had been an adjudication officer since 1999 and had worked in the Naturalization and Adjustment of Status Units.  She had also served as an asylum clerk prior to becoming an adjudication officer.  See Def. 56.1 Stat. 9171 ¶ 56; Pl. Opp. at 10 ¶ 56; Ryan Decl. ¶ 14.  Sphatt had been an adjudication officer since 2002, working in the Adjustment of Status Unit.  See Pl. Opp. at 10 ¶ 57; Def. Reply 9171 at 15; Ryan Decl. ¶ 13.  Rosina, her former supervisor, recommended her based on her competence and professionalism and described her as a "go to person based on her technical knowledge."  Def. 56.1 Stat. 9171 ¶ 57; Pl. Opp. at 10 ¶ 57; Rosina Decl. ¶ 13.  Clarke had been an adjudication officer since 2002 where she worked primarily in Naturalization.  She was a licensed attorney and had previously worked on immigration matters.  See Def. 56.1 Stat. 9171 ¶ 58; Pl. Opp. at 10 ¶ 58; Ryan Decl. ¶ 15.  Bunce and Troy, who supervised Clarke at the time, both recommended her for the position.  See Def. 56.1 Stat. 9171 ¶ 58; Pl. Opp. at 10 ¶ 58; Bunce Decl. 9171 ¶ 9; Troy Decl. 9171 ¶ 12.  Yip, an adjudication officer since 2001, had worked for seven years as an immigration inspector at JFK Airport before becoming an adjudication officer.  See Def. 56.1 Stat. 9171 ¶ 59; Pl. Opp. at 11 ¶ 59; Ryan Decl. ¶ 16.  Troy and Bunce had supervised Yip and recommended her for the vacancy.  See Def. 56.1 Stat. 9171 ¶ 59; Pl. Opp. at 11 ¶ 59; Bunce Decl. 9171 ¶ 9; Troy Decl. 9171 ¶ 10.

Rosina and Young interviewed and recommended (1) Richard Kwan, (2) Kenneth Gibe, (3) Gina Pastore, and (4) Natalie O'Connor.  See Def. 56.1 Stat. 9171 ¶ 60; Pl. Opp. at 11 ¶ 60; Rosina Decl. ¶¶ 8-11.  Kwan had been an adjudication officer since 2001 and had worked in both

the Naturalization and Adjustment of Status Units.  "During his interview, he came across as a team player and someone who was willing to give the extra effort to complete any task assigned to him."  Rosina Decl. ¶ 9; see Def. 56.1 Stat. 9171 ¶ 61; Pl. Opp. at 11 ¶ 61.  Bunce and Troy, who had supervised Kwan in Naturalization, both recommended him for the position.  See Def. 56.1 Stat. 9171 ¶ 61; Pl. Opp. at 11 ¶ 61; Bunce Decl. 9171 ¶ 9; Troy Decl. 9171 ¶ 10.  Gibe had worked as an adjudication officer since 2002.  In this position he handled "some of the most complex cases," and "trained other officers."  Def. 56.1 Stat. 9171 ¶ 62; Pl. Opp. at 11 ¶ 62; Rosina Decl. ¶ 8.  Ryan, Gibe's supervisor at the time of the interview, strongly recommended him based on his "excellent" performance.  Def. 56.1 Stat. 9171 ¶ 62; Pl. Opp. at 11 ¶ 62; Ryan Decl. ¶ 17.

On September 14, 2007, Oluyomi became aware that he was not selected for this vacancy.  See Pl. 56.1 Stat. ¶¶ 2, 4; Def. 56.1 Stat. 9171 ¶ 49; Pl. Opp. at 9 ¶ 49.  "Seven individuals were offered and accepted the position: (1) Richard Kwan, (2) Jessica Clarke, (3) Veronica Yip, (4) Jane Sphatt, (5) Glen Jupe, (6) Kenneth Gibe, and (7) Patricia White."  Def. 56.1 Stat. 9171 ¶ 50; Pl. Opp. at 9 ¶ 50; see Clark Decl. ¶ 7.  Jupe had been an adjudication officer since 1983 and had "extensive experience in various aspects of immigration."  Bunce Decl. 9171 ¶ 8; see Def. 56.1 Stat. 9171 ¶ 52; Pl. Opp. at 9 ¶ 52.  Additionally, Troy felt that Jupe's interview had gone well and that he was a "strong communicator, trainer and supervisor."  Troy Decl. 9171 ¶ 9; see Def. 56.1 Stat. 9171 ¶ 52; Pl. Opp. at 9 ¶ 52.  Rosina recommended Jupe "based on his more than 25 years experience at DHS," "[h]is outstanding demeanor," and the fact that he had resolved some of the oldest and most complex cases.  Rosina Decl. ¶ 14; see Def. 56.1 Stat. 9171 ¶ 53; Pl. Opp. at 10 ¶ 53.

Upon selection, Sphatt and Jupe were assigned to the Adjustment of Status Unit, see Def. 56.1 Stat. 9171 ¶ 63, Pl. Opp. at 11 ¶ 63, Rosina Decl. ¶¶ 13-14, Ryan Decl. ¶ 13; Kwan, Clarke, and Yip were assigned to the Naturalization Unit, see Def. 56.1 Stat. 9171 ¶ 64, Pl. Opp. at 11 ¶ 64, Rosina Decl. ¶ 9, Bunce Decl. 9171 ¶ 10, Troy Decl. 9171 ¶ 11; and Gibe and White were assigned to the Adjudications 2 Unit; see Def. 56.1 Stat. 9171 ¶ 65, Pl. Opp. at 11 ¶ 65, Rosina Decl. ¶ 8, Ryan Decl. ¶¶ 14, 17.  In his deposition, Oluyomi stated that all of these individuals were either "qualified" or "generally" qualified for the positions for which they were selected. See Def. 56.1 Stat. 9171 ¶ 66; Pl. Opp. at 11 ¶ 66; Oluyomi Dep. 9171 at 251-53.

### c.    Vacancy Announcement CIS-PHJN-14362B-RPM

In June 2007, the U.S. Citizenship and Immigration Services announced a vacancy for the position of Adjudication Officer (Policy) with Vacancy Number CIS-PHJN-14362B-RPM. See Def. 56.1 Stat. 9171 ¶ 67; Pl. Opp. at 11 ¶ 67; Boeving Decl. 9171 ¶ 6; Job Announcement: Adjudication Officer (Policy) (annexed as Ex. E to Boeving Decl. 9171) ("Job Announcement"). The position was located in DHS's Regulation and Product Management Division ("RPM") in Washington, D.C.  See Def. 56.1 Stat. 9171 ¶ 67; Pl. Opp. at 11 ¶ 67; Job Announcement.  The vacancy announcement informed applicants that the position could be filled at one of three pay scales: GS-12, GS-13, or GS-14.  See Def. 56.1 Stat. 9171 ¶ 67; Pl. Opp. at 11 ¶ 67; Job Announcement.  Candidates selected for this position would manage "RPM's humanitarian and victim protection programs," including "developing and drafting policy and regulations," "interpret[ing] and analyz[ing] various laws, regulations, and court decisions," and "provid[ing] expert advice to DHS and the Administration."  Chang Decl. ¶ 6; see Def. 56.1 Stat. 9171 ¶ 68; Pl. Opp. at 11 ¶ 68; Boeving Decl. 9171 ¶ 7; Position Description (annexed as Ex. F to Boeving Decl. 9171) ("Position Description").  "[T]he position required someone with extensive

10

knowledge of immigration law, the ability to manage programs, and excellent writing and speaking skills." Chang Decl. ¶ 6; see Def. 56.1 Stat. 9171 ¶ 68; Pl. Opp. at 11 ¶ 68; Position Description. Branch Chiefs Laura Dawkins, Michael Valverde, and Mark Phillips reviewed the applicants' materials and made recommendations to Pearl Chang, the selecting official. See Def. 56.1 Stat. 9171 ¶¶ 69-70; Pl. Opp. at 12 ¶¶ 69-70; Chang Decl. ¶¶ 4-5; Dawkins Decl. ¶¶ 2-4; Phillips Decl. ¶¶ 2-4; Valverde Decl. ¶¶ 2-4. Human Resources Specialist Susan Clark prepared a certificate of eligible candidates for each GS-level, which she sent to RPM. See Def. 56.1 Stat. 9171 ¶ 71; Pl. Opp. at 12 ¶ 71; Clark Decl. ¶ 10; Certificate of Eligibles (annexed as Ex. M to Clark Decl.) ("Certificate of Eligibles").

Oluyomi applied for this vacancy. See Def. 56.1 Stat. 9171 ¶ 72; Pl. Opp. at 12 ¶ 72; Clark Decl. ¶ 9; Oluyomi Application (annexed as Ex. L to Clark Decl.) ("Oluyomi Application"); Oluyomi Dep. 9171 at 306, 396-97. He was placed at the top of the GS-13 "certificate" (that is, list of candidates) due to his 10-point veteran's preference. Def. 56.1 Stat. 9171 ¶ 74; Pl. Opp. at 13 ¶ 74; Clark Decl. ¶ 10; Certificate of Eligibles. He did not qualify for a GS-14 certificate. See Def. 56.1 Stat. 9171 ¶ 75; Pl. Opp. at 13 ¶ 75; Clark Decl. ¶ 10. Because Oluyomi was at the top of the GS-13 list and had a veteran's preference, he was considered a "preference eligible candidate." Def. 56.1 Stat. 9171 ¶ 76; Pl. Opp. at 13 ¶ 76; Clark Decl. ¶ 11.

Dawkins, Valverde, and Phillips unanimously recommended Anne-Marie Mulagha for the position. See Def. 56.1 Stat. 9171 ¶ 80; Pl. Opp. at 14 ¶ 80; Chang Decl. ¶ 9; Dawkins Decl. ¶ 9; Phillips Decl. ¶ 7; Valverde Decl. ¶ 7. Mulagha was recommended based on her "work experience and educational background." Dawkins Decl. ¶ 7; Phillips Decl. ¶ 8; see Valverde Decl. ¶ 8; Def. 56.1 Stat. 9171 ¶ 81; Pl. Opp. at 14 ¶ 81. She had "worked as a human rights officer with the United Nations High Commissioner for Human Rights," and "as an asylum

officer at DHS for four years prior to selection," and she was a licensed attorney.  Dawkins Decl.

¶ 7; Phillips Decl. ¶ 8; see Def. 56.1 Stat. 9171 ¶ 81; Pl. Opp. at 14 ¶ 81; Valverde Decl. ¶ 8.

Dawkins, Valverde, and Phillips did not recommend Oluyomi because they felt that, although

"highly creditable," his educational background and experience were not relevant for the

position.  Additionally, "RPM already had a sufficient number of adjudication policy officers to

develop, manage, and provide subject matter expertise for the adjustment of status and

admissibility programs (which was Mr. Oluyomi's primary expertise at DHS)."  Dawkins Decl.

¶ 8; see Def. 56.1 Stat. 9171 ¶ 82; Pl. Opp. at 14 ¶ 82; Phillips Decl. ¶ 9; Valverde Decl. ¶ 9.

Chang interviewed and selected Mulagha for the position based on her "ability, skills,

and knowledge."  Def. 56.1 Stat. 9171 ¶¶ 83-84; Pl. Opp. at 14 ¶¶ 83-84; see Chang Decl. ¶¶ 10-

11.  She determined, after comparing the qualifications of Oluyomi and Mulagha, that Mulagha

was a "better choice" for the position.  Def. 56.1 Stat. 9171 ¶ 85; Pl. Opp. at 15 ¶ 85; Chang

Decl. ¶ 12.  Mulagha was selected for the position from the GS-12 list.  See Def. 56.1 Stat. 9171

¶ 86; Pl. Opp. at 15 ¶ 86; Chang Decl. ¶ 10; Clark Decl. ¶ 13.  Mulagha is an African-American

female from Malawi.  See Def. 56.1 Stat. 9171 ¶ 87; Pl. Opp. at 15 ¶ 87; Chang Decl. ¶ 10.

2.     Facts Relating to the Claims Raised in 09 Civ. 10293

a.     Background Facts

During the time period at issue, Oluyomi's direct supervisor was Supervisory

Adjudication Officer Earleen Wilson and/or Supervisory Adjudication Officer William Taylor;

his second line supervisor was Scott Ruben, who was also the Site Manager; his third line

supervisor was Enrica Troy, who was also the Section Chief of his unit; his fourth line

supervisor and Field Office Director was Dennis Bunce; and the District Director was Andrea

Quarantillo.  See Def. 56.1 Stat. 10293 ¶¶ 6-10; Pl. Opp. at 18-19 ¶¶ 6-10; Boeving Decl. 10293

12

¶¶ 7-8; Oluyomi Affidavit, dated Nov. 5, 2008 (annexed as Ex. F to Boeving Decl. 10293) at
GOVT78-79; Oluyomi Affidavit, dated Jan. 26, 2009 (annexed as Ex. G to Boeving Decl.
10293) at GOVT227; Deposition of Alaba Oluyomi, dated Nov. 30, 2010 (annexed as Ex. C to
Boeving Decl. 10293) ("Oluyomi Dep. 10293") at 9-10, 77, 86, 102, 225.

>          b.          Oluyomi's EEO Activity

Oluyomi first contacted an EEO counselor on September 18, 2007, after he was not
selected for the Senior Adjudication Officer position, Vacancy Announcement number CIS-
137951-BUR.  See Def. 56.1 Stat. 10293 ¶¶ 38, 43; Pl. Opp. at 22 ¶¶ 38, 43; Boeving Decl.
10293 ¶ 11; Individual Complaint of Employment Discrimination, dated Nov. 7, 2007 (annexed
as Ex. J to Boeving Decl. 10293) ("Nov. 7 Compl. of Emp. Discrim.").  On November 9, 2007,
Oluyomi filed a complaint with the EEO alleging that he was not selected for the position on
account of his race, color, and national origin and claiming that his non-selection was a result of
discrimination by Bunce, Troy and Quarantillo.  See Def. 56.1 Stat. 10293 ¶¶ 44-45; Pl. Opp. at
22 ¶¶ 44-45; Boeving Decl. 10293 ¶¶ 10, 12; Nov. 7 2007 Compl. of Emp. Discrim. at 2;
Oluyomi Dep. 10293 at 65; Oluyomi Dep. 10293 at 173-74, 176-77.

>          c.          Oluyomi's One-Day Suspension

About four months later, Christian Reyes provided a memorandum to his supervisor
stating that on the previous day, March 13, 2008, Oluyomi pushed him near the elevator bank on
the 7th floor of the office.  See Def. 56.1 Stat. 10293 ¶ 11; Pl. Opp. at 19 ¶ 11; Bunce Decl.
10293 ¶ 4; Memorandum from Reyes to Pettway, dated Mar. 14, 2008 (annexed as Ex. L to
Bunce Decl. 10293) ("Memorandum from Reyes to Pettway"); Troy Decl. 10293 ¶ 4;
Memorandum from White to Troy, dated Apr. 2, 2008 (annexed as Ex. P to Troy Decl. 10293)
("Memorandum from White to Troy").  Supervisor Patricia White, an African-American female,

witnessed Oluyomi push Reyes on this date, informed Troy of the alleged incident, and provided a written statement regarding what she claimed to have witnessed.  See Def. 56.1 Stat. 10293 ¶ 12; Pl. Opp. at 19 ¶ 12; Troy Decl. 10293 ¶ 4; Memorandum from White to Troy.  Troy informed Bunce of the allegation.  See Def. 56.1 Stat. 10293 ¶ 13; Pl. Opp. at 19 ¶ 13; Bunce Decl. 10293 ¶ 4; Troy Decl. 10293 ¶ 4.  Earlier, in February 2008, Supervisory Language Specialist Viviane Haddad had received a complaint from Language Specialist Amelia Correa regarding Oluyomi's conduct toward her, and later, in April 2008, Haddad received a complaint from Language Specialist Fabian Acebal regarding Oluyomi's conduct toward him.  These complaints were later put into writing.  See Def. 56.1 Stat. 10293 ¶¶ 14-15; Pl. Opp. at 19 ¶¶ 14-15; Haddad Decl. ¶ 4; Correa and Acebal Complaints (annexed as Ex. R to Haddad Decl.).  Haddad also informed Michael Borgen (her first line supervisor), Quarantillo, and Bunce about Correa and Acebal's complaints.  See Def. 56.1 Stat. 10293 ¶ 16; Pl. Opp. at 19 ¶ 16; Haddad Decl. ¶ 6.  Bunce did not request that Haddad solicit information regarding the complaints from Correa or Acebal.  See Def. 56.1 Stat. 10293 ¶ 17; Pl. Opp. at 19 ¶ 17; Haddad Decl. ¶ 6.

On April 4, 2008, Scott Ruben provided a memorandum to Troy, his supervisor, describing an incident between himself and Oluyomi that occurred that day and alleging that Oluyomi had been "hostile and disrespectful" to him.  Def. 56.1 Stat. 10293 ¶ 18; Pl. Opp. at 19 ¶ 18; Ruben Decl. ¶ 6; Memorandum from Ruben to Troy, dated Apr. 4, 2008 (annexed as Ex. S to Ruben Decl.) ("Memorandum from Ruben to Troy"); Bunce Decl. 10293 ¶ 8; Troy Decl. 10293 ¶ 6.  The following day, Bunce sent a memorandum to Quarantillo requesting that Oluyomi be disciplined.  See Def. 56.1 Stat. 10293 ¶ 19; Pl. Opp. at 20 ¶ 19; Bunce Decl. 10293 ¶ 9; Memorandum from Bunce to Quarantillo, dated Apr. 5, 2008 (annexed as Ex. M to Bunce Decl. 10293); Quarantillo Decl. 10293 ¶ 4.  On April 24, 2008, Bunce proposed that Oluyomi be

14

suspended for five days.  See Def. 56.1 Stat. 10293 ¶ 20; Pl. Opp. at 20 ¶ 20; Bunce Decl. 10293

¶ 10; Letter from Bunce to Oluyomi (annexed as Ex. N to Bunce Decl. 10293); Quarantillo Decl.

10293 ¶ 5; Pl. 56.1 Stat. ¶ 36.  Oluyomi responded by denying all the allegations.  See Def. 56.1

Stat. 10293 ¶ 21; Pl. Opp. at 20 ¶ 21; Quarantillo Decl. 10293 ¶ 6; Oluyomi Dep. 10293 at 39-

40.  On July 28, 2008, Quarantillo issued Oluyomi a one-day suspension, effective August 4,

2008.  See Def. 56.1 Stat. 10293 ¶ 22; Pl. Opp. at 20 ¶ 22; Quarantillo Decl. 10293 ¶ 8; Letter

from Quarantillo to Oluyomi, dated July 28, 2008 (annexed as Ex. T to Quarantillo Decl. 10293)

("Letter from Quarantillo to Oluyomi"); Oluyomi Dep. 10293 at 41, 103.  Prior to reaching the

decision to suspend Oluyomi for one day, Quarantillo considered the memoranda discussed

above, as well as statements made by supervisors in Oluyomi's chain of command, including

Bunce, each of whom indicated that Oluyomi's behavior had improved.  See Def. 56.1 Stat.

10293 ¶ 23; Pl. Opp. at 20 ¶ 23; Quarantillo Decl. 10293 ¶¶ 7-9.

### d.    Oluyomi's Fourteen-Day Suspension

Oluyomi's one-day suspension was effective August 4, 2008, with a return-to-work date

of August 5, 2008.  See Def. 56.1 Stat. 10293 ¶ 25; Pl. Opp. at 20 ¶ 25; Quarantillo Decl. 10293

¶ 8; Letter from Quarantillo to Oluyomi; Oluyomi Dep. 10293 at 41.  On August 4, 2008,

however, Oluyomi reported to work, intending to engage in his regular work duties.  See Def.

56.1 Stat. 10293 ¶ 26; Pl. Opp. at 20 ¶¶ 26-27; Oluyomi Dep. 10293 at 207-09, 215-17.  Taylor,

Oluyomi's supervisor that day, reminded him that he was on suspension, asked that he leave the

building, and informed him that if he did not leave the Federal Protective Service ("FPS") would

be called.  See Def. 56.1 Stat. 10293 ¶ 27; Pl. Opp. at 20 ¶ 27; Troy Decl. 10293 ¶ 7; Oluyomi

Dep. 10293 at 221, 223-24; Boeving Decl. 10293 ¶ 9; Interrogatories: William Taylor (annexed

as Ex. H to Boeving Decl. 10293) ("Interrogatories: William Taylor") at GOVT261-62.

Oluyomi did not leave and FPS was called to remove Oluyomi from the building.  See Def. 56.1 Stat. 10293 ¶¶ 28-29; Pl. Opp. at 20-21 ¶¶ 28-29; Troy Decl. 10293 ¶ 7; Oluyomi Dep. 10293 at 33-35, 221-24, 228-29; Boeving Decl. 10293 ¶ 9; Interrogatories: William Taylor at GOVT262; Quarantillo Decl. 10293 ¶ 15; Federal Protective Service (annexed as Ex. V to Quarantillo Decl. 10293).  As the FPS arrived, Troy again asked Oluyomi to leave the building and he again refused.  See Def. 56.1 Stat. 10293 ¶ 30; Pl. Opp. at 21 ¶ 30; Troy Decl. 10293 ¶ 7; Oluyomi Dep. 10293 at 83, 224-25.

On August 8, 2008, Troy asked Bunce to discipline Oluyomi for reporting to work on the date of his suspension and refusing requests to leave the building.  See Def. 56.1 Stat. 10293 ¶ 31; Pl. Opp. at 21 ¶ 31; Troy Decl. 10293 ¶ 8; Memorandum from Bunce to Troy, dated Aug. 8, 2008 (annexed as Ex. Q to Troy Decl. 10293) ("Aug. 8 Mem. from Bunce to Troy"); Oluyomi Dep. 10293 at 241-45; Bunce Decl. 10293 ¶ 13.  On September 18, 2008, Bunce proposed that Oluyomi be suspended for fourteen days as a result of the August 4, 2008 incident.  See Def. 56.1 Stat. 10293 ¶ 32; Pl. Opp. at 21 ¶ 32; Bunce Decl. 10293 ¶ 15; Letter from Bunce to Oluyomi, dated Sept. 18, 2008 (annexed as Ex. O to Bunce Decl. 10293) ("Sept. 2008 Letter from Bunce to Oluyomi"); Oluyomi Dep. 10293 at 241-42, 245-46.  Oluyomi did not respond to this proposal, except to inform Quarantillo that he would pursue EEO action if he were suspended.  See Def. 56.1 Stat. 10293 ¶ 33; Pl. Opp. at 21 ¶ 33; Pl. 56.1 Stat. ¶ 66; Quarantillo Decl. 10293 ¶ 13; Memorandum from Oluyomi to Quarantillo, dated Sept. 26, 2008 (annexed as Ex. U to Quarantillo Decl. 10293); Oluyomi Dep. 10293 at 246-47.

On January 6, 2009, Quarantillo issued Oluyomi a fourteen-day suspension because of the August 4, 2008 incident.  See Def. 56.1 Stat. 10293 ¶ 34; Pl. Opp. at 21 ¶¶ 32, 34; Quarantillo Decl. 10293 ¶ 15; Letter from Quarantillo to Oluyomi, dated Jan. 6, 2009 (annexed

as Ex. W to Quarantillo Decl. 10293) ("Jan. 6 Letter from Quarantillo to Oluyomi"); Oluyomi

Dep. 10293 at 241-42, 247-48.  Ruben served Oluyomi with notice of the suspension, at which

time Ruben was "very respectful" to Oluyomi.  See Def. 56.1 Stat. 10293 ¶ 36; Pl. Opp. at 22

¶ 36; Oluyomi Dep. 10293 at 270, 274; Ruben Decl. ¶ 8.  Ruben did not propose or request that

Oluyomi be suspended for the August 4, 2008 incident; nor was he the deciding official with

respect to the suspension.  See Def. 56.1 Stat. 10293 ¶ 37; Pl. Opp. at 22 ¶ 37; Oluyomi Dep.

10293 at 267-70; Ruben Decl. ¶ 8; Jan. 6 Letter from Quarantillo to Oluyomi; Aug. 8 Mem. from

Bunce to Troy; Sept. 2008 Letter from Bunce to Oluyomi.

II.     APPLICABLE LAW

        A.      Law Governing Summary Judgment

        Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is

appropriate when "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of

material fact "may reasonably be resolved in favor of either party" and thus should be left to the

finder of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

        When determining whether a genuine issue of material fact exists, courts must resolve all

ambiguities and draw all factual inferences in favor of the nonmoving party.  See id. at 255

(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the

moving party has shown that there is no genuine issue as to any material fact and that it is

entitled to a judgment as a matter of law, the nonmoving party "must come forward with

'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in

original), and "may not rely on conclusory allegations or unsubstantiated speculation," Jeffreys

v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  "[S]peculation alone is insufficient to defeat a motion for summary judgment." McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006).  Rather, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor . . . ."  Anderson, 477 U.S. at 256.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case."  Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (internal quotation marks, citation, and brackets omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."  Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996); accord Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.") (internal quotation marks and citation omitted); Feurtado v. City of New York, 337 F. Supp. 2d 593, 599-600 (S.D.N.Y. 2004).

Although the Second Circuit has noted that "an extra measure of caution" is needed in granting summary judgment in discrimination cases since direct evidence of discriminatory intent is rare, a finding of summary judgment is nonetheless appropriate for discrimination claims lacking a genuine issue of material fact.  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in

18

the fact-intensive context of discrimination cases."), cert. denied, 534 U.S. 993 (2001).

     B.     Law Governing Discrimination Claims

     Claims of discrimination under Title VII are analyzed under the framework established

by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under

McDonnell Douglas, the plaintiff carries the initial burden of establishing a prima facie case of

discrimination.  See 411 U.S. at 802; accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506

(1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  This burden has

been characterized as "minimal."  McPherson, 457 F.3d at 215 (internal quotation marks and

citation omitted); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (internal

quotation marks and citation omitted).

     To establish a prima facie case of disparate treatment, a plaintiff must show that: "(1) he

was a member of a protected class; (2) he was competent to perform the job in question, or was

performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4)

the action occurred under circumstances that give rise to an inference of discrimination."

Spiegel, 604 F.3d at 80 (citation omitted).  The fourth element is a "flexible one that can be

satisfied differently in differing factual scenarios."  Chertkova v. Conn. Gen. Life Ins. Co., 92

F.3d 81, 91 (2d Cir. 1996).

     If the plaintiff establishes a prima facie case, a presumption of discrimination is created

and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for

the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; accord St. Mary's Honor

Ctr., 509 U.S. at 506-07; Burdine, 450 U.S. at 254; Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir.

2006), cert. denied, 549 U.S. 1282 (2007).  If the employer articulates such a reason for its

action, the presumption of discrimination is eliminated and "the employer will be entitled to

summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) (citing cases). Such evidence may include, for example, a showing that "'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Burdine, 450 U.S. at 253) (additional citation omitted). Importantly, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (alteration in original); accord Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000). Thus, it is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder must believe the plaintiff's explanation of intentional discrimination.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 519). In other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination . . . ." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis, and bracketing omitted).

Nevertheless, while the plaintiff must prove that the defendant's proffered reasons for termination were pretextual, the plaintiff is not always required to "introduce additional, independent evidence of discrimination." Reeves, 530 U.S. at 149. "In appropriate circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is dissembling to cover up a discriminatory purpose." Id. at 147.

Despite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case

and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.  E.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 188 (2d Cir. 2006) (declining to resolve dispute regarding establishment of prima facie case of age discrimination on the ground that plaintiff had not "pointed to any record evidence to dispute [defendant's] legitimate reason . . . for the alleged adverse employment action"); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether prima facie case was made because the defendant had "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] ha[d] failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact"); accord Lugo v. Shinseki, 2010 WL 1993065, at *14 (S.D.N.Y. May 19, 2010); Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 439 (S.D.N.Y. 2007), aff'd, 331 F. App'x 874 (2d Cir. 2009).

Claims of retaliation are analyzed according to the same framework as disparate treatment claims.  See, e.g., Coffey v. Dobbs Int'l. Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999).

## III.    DISCUSSION

Oluyomi claims that the Government discriminated against him on the basis of his race, color, and national origin in violation of Title VII, and also retaliated against him.  See 9171 Compl. at 1-3; 10293 Compl. at 1-3.  We begin by discussing his failure to promote claims and then address his claims regarding two incidents of discipline that were imposed on him.

### A.    Failure to Promote Claims

Oluyomi asserts that his non-selection for two different positions at DHS was based on his race, color, and national origin.  We discuss Oluyomi's claim with regard to each of these positions separately.

21

1.      Vacancy CIS-137951-BUR: Senior Adjudication Officer

Oluyomi alleges that his non-selection for the Senior Adjudication Officer position was discriminatory.  See 9171 Compl. at 3.  Specifically, Oluyomi asserts that he was discriminated against when: (1) he was assigned to interview with Bunce and Troy in the Naturalization Unit, see Oluyomi Dep. 9171 at 51, 103-04, 152-55, 174, 192-93, 201, 238-40; (2) his interview was broken into two parts on the same day, id. at 214; and (3) he was not selected for the Senior Adjudication Officer position, id. at 251-53.  See Pl. Mem. at 2-13.

As an initial matter, the first two of these complaints cannot support a claim of discrimination.  Under Title VII, relief is available only for an "adverse employment action." Spiegel, 604 F.3d at 80.  An adverse employment action is "a materially adverse change in the terms and conditions of employment . . . which is more disruptive than a mere inconvenience or alteration of job responsibilities."  Joseph, 465 F.3d at 90 (internal citations and quotation marks omitted).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)).  Thus, even if it were true that the defendants did not have a proper basis for assigning Bunce and Troy to interview Oluyomi or for breaking the interview into two parts, this would not support a claim for discrimination.  Accordingly, we consider the evidence on these matters as relevant only to whether Oluyomi has shown discriminatory treatment with respect to the failure to select him for the Senior Adjudication Officer position.

Additionally, to the extent Oluyomi raises a claim about the application of his veterans' preference to his non-selection for the Senior Adjudication Officer position, he has failed to state

a Title VII claim.  It is the Veterans Employment Opportunities Act ("VEOA"), 5 U.S.C.

§ 3330a, et seq., and not Title VII, that provides "preference eligible veterans with a method for

seeking redress where their veterans' preference rights have been violated in hiring decisions

made by the federal government," Kirkendall v. Dep't of Army, 479 F.3d 830, 837 (Fed. Cir.),

cert. denied, 552 U.S. 948 (2007); Murty v. Veneman, 2005 WL 1320130, at *12 (E.D. Wash.

June 2, 2005) ("Plaintiff's activities regarding the veterans preference are not protected rights

under Title VII, thus he cannot establish a prima facie case of retaliation based on those

activities.") (citation omitted).[4]

Turning to the merits of the failure to promote claim, the Government has provided

legitimate, non-discriminatory reasons for Oluyomi's non-selection for the Senior Adjudication

Officer position on the ground that he did not interview well, that he spoke to others in a

condescending manner, and that he lacked experience.  See Bunce Decl. 9171 ¶ 7; Troy Decl.

9171 ¶ 8.  Accordingly, instead of inquiring whether Oluyomi has met a prima facie case, we

turn to the question of whether Oluyomi has pointed to evidence that reasonably supports a

finding of intentional discrimination on account of his race, color, and national origin.

In this case, Oluyomi has offered virtually no proof of discrimination other than his claim

that these facially legitimate reasons offered by the Government were not its true reasons for

failing to promote him but were instead "a pretext for discrimination."  Patterson, 375 F.3d at

221.  The only other evidence he offers on this point involved the manner in which he was

_____

[4]  Oluyomi cannot obtain relief in this action directly under the VEOA because he never made
such a claim in his complaint.  Nor has he ever asserted that he exhausted the administrative
remedies required by this statute, including the filing of an appeal with the Merits Systems
Protection Board under 5 U.S.C. § 3330a.  See generally Conyers v. Rossides, 558 F.3d 137, 149
n.16 (2d Cir. 2009).

interviewed.  With regard to the division of Oluyomi's interview into two parts, the Government

asserts that this division occurred because of a scheduling conflict.  <u>See</u> Troy Decl. 9171 ¶ 7.

While Oluyomi states that this explanation is not "credible," Pl. Opp. at 6 ¶ 44, he fails to cite

any evidence to dispute the Government's statement.  Rather, Oluyomi asserts in his opposition

papers that the only reason given by Bunce for "terminating the interview" was that Bunce had

"goofed."  <u>Id</u>.  But the only citation Oluyomi provides in support of this contention, his prior

EEO affidavit, does not state that Bunce had "goofed."  Instead, it asserts that "[t]he interview

process was . . . abruptly terminated for reasons that could not be explained," and that he was

"called back a few hours later to complete the interview."  Affidavit of Alaba Oluyomi, dated

Feb. 13, 2008 (annexed as Ex. 31 to Pl. Motion) ("Exhibit 31") at 5; Oluyomi Decl. ¶ 31.

Additionally, Troy stated that a scheduling conflict was the reason for dividing Oluyomi's

interview into two parts.  Declaration of Enrica M. Troy (annexed as Ex. 10 to Pl. Motion) at 8;

Oluyomi Decl. ¶ 10.  With respect to the fact that Oluyomi was assigned to interview with Bunce

and Troy, the Government contends, and plaintiff does not dispute, that this occurred because at

least one member of the other two interview teams had previously served as Oluyomi's

permanent supervisor.  <u>See</u> Oluyomi Dep. 9171 at 156-57; Def. 56.1 Stat. 9171 ¶¶ 38, 41-43; Pl.

Opp. at 5-6 ¶¶ 38, 41-43.

　　　　Turning to the reasons given for Oluyomi's non-promotion, there is nothing to suggest

that the reasons given by the Government were pretextual.  With respect to the assertion that

Oluyomi interviewed poorly, this is a criterion that case law recognizes can support a non-

discriminatory reason for an adverse employment action.  <u>See</u> <u>Byrnie v. Town of Cromwell, Bd.</u>

<u>of Educ.</u>, 243 F.3d 93, 104-05 (2d Cir. 2001) ("there is nothing unlawful about an employer's

basing its hiring decision on subjective criteria, such as the impression an individual makes

24

during an interview," so long as its "explanation of its reasons [are] clear and specific") (internal quotation marks, brackets, and citation omitted); accord Hurd v. N.Y. Health & Hosps. Corp., 2007 WL 678403, at *4 (S.D.N.Y. Mar. 5, 2007) ("subjective impressions from an interview alone have been upheld as a valid justification absent a showing of discriminatory motive") (citations omitted), aff'd, 2008 WL 5120624 (2d Cir. Dec. 8, 2008).  The evidence reflects that Bunce did not think Oluyomi was one of the strongest candidates because: (1) he provided "boilerplate answers" to the interview questions, (2) the interview confirmed Bunce's impression that Oluyomi had a tendency to speak to others in a "condescending manner," (3) Bunce "questioned whether Oluyomi would be an appropriate example to other officers and whether he would be able to effectively and properly train other officers."  Def. 56.1 Stat. 9171 ¶ 46; Bunce Decl. 9171 ¶ 7; see Pl. 56.1 Stat. ¶ 7; Def. 56.1 Stat. Resp. 9171 ¶ 7.  Similarly Troy did not think Oluyomi was one of the strongest candidates because: (1) Troy felt that he "had difficulty responding to [the] questions at the interview" and did not appear to be an "effective communicator," and (2) during the interview he "continually stressed" his educational background rather than discuss the details of his experience as an adjudications officer, while Troy felt that his education was not "relevant" to the position.  See Def. 56.1 Stat. 9171 ¶ 47; Troy Decl. 9171 ¶ 8.

While Oluyomi states that these explanations are not "tenable," Pl. Opp. at 6-7 ¶¶ 46-47, he fails to provide any evidence to dispute the reasons given by Troy and Bunce.  Nor does he contest that the interview was an important part of the selection process.  Id. at 4 ¶ 22; Def. 56.1 Stat. 9171 ¶ 22.  Instead, Oluyomi cites to a performance review stating that he conducted interviews of customers well and to the fact that he was not counseled for any problems related to interviewing.  Pl. Opp. at 6-7 ¶¶ 46-47.  Neither of these matters, however, creates a material

issue of fact.  First, with regard to the performance review, Oluyomi presents no evidence that either Troy or Bunce considered the written review during the selection process.  In fact, when asked during the EEO process whether performance reviews were considered by the selecting officials, Oluyomi replied, "I do not believe performance appraisals were considered."  Exhibit 31 at 8.  Additionally, the referenced review discusses only Oluyomi's abilities as an interviewer, as his position at DHS involved interviewing immigration applicants, not the impression he gave as an interviewee.  See Performance Appraisal Record (annexed as Ex. 5 to Pl. Motion) at 8 (Oluyomi is "able to, when required, conduct 10-12 interviews per day. . . .  His interviews are professionally conducted and all requests for additional evidence only reflect deficiencies in the record."); Oluyomi Decl. ¶ 5.  And Oluyomi presents no additional evidence suggesting that the review related to his performance as an interviewee.  Moreover, while Oluyomi may disagree with the evaluation of his abilities as an interviewee, this disagreement does not create a triable issue of fact as to Troy and Bunce's decision not to recommend Oluyomi for the vacancy.  See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999) (plaintiff's "own opinions about her qualifications do not give rise to a material fact dispute"); Rosengarten v. J.C. Penney Co., 605 F. Supp. 154, 157 (E.D.N.Y. 1985) ("[i]t is the perception of the decision-maker, and not that of the plaintiff himself, which is relevant").

Troy, Bunce, and Rosina also had concerns regarding Oluyomi's ability to accept criticism and doubted whether he would be a good example to other officers.  See Bunce Decl. 9171 ¶ 7; Rosina Decl. ¶ 15; Troy Decl. 9171 ¶ 8.  Specifically, Rosina, Oluyomi's former supervisor, did not recommend Oluyomi to the panel because she was concerned about "his inability to accept constructive criticism" and his "condescending attitude toward others."  See Def. 56.1 Stat. 9171 ¶ 48; Rosina Decl. ¶ 15.  While Oluyomi relies on statements by William

Taylor and Earleen Wilson to controvert these statements, see Pl. Motion at 6 (citing

Interrogatories: William Taylor (annexed as Ex. 23 to Pl. Motion); Interrogatories: Earleen

Wilson (annexed as Ex. 24 to Pl. Motion)), neither Taylor nor Wilson was involved in selecting

the applicant to fill the vacancy in question, see Ryan Decl. ¶ 9.  In fact, Taylor stated that he has

"no direct information" regarding the facts giving rise to Oluyomi's failure to promote claim.

See Interrogatories: William Taylor at 2.

As to Oluyomi's lack of experience as an adjudicator or in the Naturalization Unit,

Oluyomi states that he "was one of the very best candidates at the time of the job interview."  Pl.

Opp. at 6 ¶ 46.  And he purports to dispute Troy's statement that she did not recommend

Oluyomi because, inter alia, he did not have as much immigration experience as the other

applicants, by noting that three of the selectees had five to six years experience as adjudication

officers.  See Pl. Motion at 6-7.  However, Oluyomi's "own opinions about [his] qualifications

do not give rise to a material fact dispute."  Bullington, 186 F.3d at 1318; see Witkowich v.

Gonzales, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) ("Plaintiff's disagreement with the way in

which [defendant] weighed his . . . qualifications does not create an issue of material fact.")

(citing Jimoh v. Ernst & Young, 908 F. Supp. 220, 226 (S.D.N.Y. 1995) ("As a matter of law, an

employee's disagreement with an employer's business decision is insufficient to prove

discriminatory conduct.")).  An employer has the right to decide how it will value the

qualifications of different candidates, see Scaria v. Rubin, 117 F.3d 652, 654-55 (2d Cir. 1997)

(affirming grant of summary judgment in defendant's favor where defendant had chosen to hire

a person who had less education but more relevant experience than plaintiff did), and the

Government's "'decisions regarding the professional experience and characteristics sought in a

candidate, as well as the [recommending officials'] evaluation of [Oluyomi's] qualifications, are

entitled to deference,'" O'Leary v. N.Y.S. Unified Court Sys., 2007 WL 2244483, at *7

(S.D.N.Y. Aug. 6, 2007) (quoting Sarmiento v. Queens Coll., 386 F. Supp. 2d 93, 97-98

(E.D.N.Y.), aff'd, 153 F. App'x 21 (2d Cir. 2005)).

> Moreover, the Second Circuit has held that

> When a plaintiff seeks to prevent summary judgment on the strength of a
> discrepancy in qualifications ignored by an employer, that discrepancy must bear
> the entire burden of allowing a reasonable trier of fact to not only conclude the
> employer's explanation was pretextual, but that the pretext served to mask
> unlawful discrimination.  In effect, the plaintiff's credentials would have to be so
> superior to the credentials of the person selected for the job that no reasonable
> person, in the exercise of impartial judgment, could have chosen the candidate
> selected over the plaintiff for the job in question.

Byrnie, 243 F.3d at 103 (citations omitted).  As Oluyomi himself admits, all of the selectees who

accepted the Senior Adjudication Officer position were qualified for the position, see Pl. Opp. at

11 ¶ 66; Def. 56.1 Stat. 9171 ¶ 66; Oluyomi Dep. 9171 at 251-53, and there is nothing about

their experience that suggests that no reasonable person could have chosen the applicants

selected over Oluyomi for the vacancy at issue, see Shaheen v. Gonzales, 2006 WL 3164763, at

*7-8 (S.D.N.Y. Nov. 1, 2006) ("[Wh]ile [plaintiff] is undoubtedly well qualified for the job . . . ,

the Court cannot say that [the individual selected] was unqualified, or that no reasonable person

could chose [the individual selected] over [plaintiff].  The discrepancy in qualifications alone is

not enough to show pretext."); Perez v. Consol. Edison Corp. of N.Y., 2006 WL 2707316, at *10

(S.D.N.Y. Sept. 20, 2006) ("While reasonable minds could disagree about which of two

candidates – plaintiff or defendant . . .  – was more qualified for a promotion, it is not this

Court's role to act as a super personnel department or to second-guess an employer's

nondiscriminatory business judgment.'") (internal quotation marks and citations omitted).

> Oluyomi also references his positive performance reviews and the fact that he had served

as acting supervisor on one occasion.  Pl. Opp. at 6-8 ¶¶ 46-47; Pl. Motion at 6.  Oluyomi has

submitted no evidence, however, that either Troy or Bunce considered his performance reviews

in making their recommendations, or that these two interviewers were aware that Oluyomi had

previously served as acting supervisor.  In fact, Oluyomi stated in his deposition that his

previous service as an acting supervisor was not listed on his resume, and that he could not recall

whether he had informed Bunce and Troy of his previous service.  See F.D.I.C. v. Nat'l Union

Fire Ins. Co. of Pittsburgh, Pa., 205 F.3d 66, 75 (2d Cir. 2000) ("memory lapses . . . do not create

genuine issues of material fact").

        In sum, Oluyomi has not come forward with evidence that would permit a reasonable

jury to conclude that the Government's stated reasons for his non-selection were a pretext for

discrimination.  Thus, the Government is entitled to summary judgment on Oluyomi's failure to

promote claim with regard to the Senior Adjudication Officer position.

### 2.   Vacancy CIS-PHJN-14362B-RPM: Adjudications Officer (Policy)

        Oluyomi's failure to promote claim with regard to the Adjudications Officer (Policy)

position centers on his complaint that, in making the selection, DHS officials "disregard[ed]

. . . [his] veterans' preference rights."  9171 Compl. at 3; see Pl. Motion at 7-11; Oluyomi Dep.

9171 at 316 (stating that the disregard of his veterans' preference right was "main thing he

pointed out in [his] EEO complaint"); Oluyomi Dep. 9171 at 320 ("the main bone of contention,

like I said earlier, is that the veterans' preference was violated"); Oluyomi Dep. 9171 at 321,

334-37, 341, 343-44, 347, 352.  As discussed earlier, Title VII does not provide preference-

eligible veterans with a method for seeking redress when their veterans' preference rights have

been violated.  See Murty, 2005 WL 1320130, at *12.  Thus, Oluyomi cannot prevail on his

discrimination claim based on a violation of his veterans' preference.

Furthermore, the Government has provided a legitimate, non-discriminatory reason for Oluyomi's non-selection: namely, that Oluyomi was not as qualified as Mulagha, the individual selected to fill the vacancy.  See Mauro v. S. New England Telecomm., Inc., 208 F.3d 384, 387-88 (2d Cir. 2000) (that selectee was "well-qualified" for the position is a legitimate non-discriminatory reason for her selection); Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 311 (S.D.N.Y. 2009) ("[defendant] has offered a legitimate, non-discriminatory reason for its action, that is, that [the selecting individual] believed that another applicant was more qualified than plaintiff").  There is no evidence in the record to suggest that this reason is pretextual.  Indeed, the Government has provided undisputed evidence regarding the DHS officials' reasons for recommending and selecting Mulagha.  Specifically, Dawkins, Phillips, and Valerde state that they recommended Mulagha based on her "work experience and educational background," see Def. 56.1 Stat. 9171 ¶ 81; Pl. Opp. at 14 ¶ 81; Dawkins Decl. ¶ 7; Phillips Decl. ¶ 8; Valverde Decl. ¶ 8, and Chang states that she selected Mulagha based on her "ability, skills, and knowledge," see Def. 56.1 Stat. 9171 ¶¶ 83-84; Pl. Opp. at 14-15 ¶¶ 83-84; Chang Decl. ¶¶ 10-11.  Oluyomi does not contest this evidence or the explanation provided by DHS, see Def. 56.1 Stat. 9171 ¶¶ 81-82, 84-85; Pl. Opp. at 14-15  ¶¶ 81-82, 84-85.  Nor does he dispute that Mulagha was qualified for the position at issue.  See Def. 56.1 Stat. 9171 ¶ 106; Pl. Opp. at 17 ¶ 106.

Oluyomi argues that the recommending and selecting officials erred in applying the veterans' preference rules and other civil service selection rules.  See Pl. Opp. at 13-14 ¶¶ 77-79; Pl. Motion at 7-11.  However, even if the DHS officials misapplied these rules, Oluyomi has offered no evidence to suggest that the misapplication was the result of discriminatory animus based on race, color, or national origin.  In fact, the undisputed evidence demonstrates that a

candidate's race, color, and national origin had no influence on the DHS officials' selection

decisions as Mulagha, the only applicant selected for the position, is African-American, and she,

like Oluyomi, was originally from Africa.  Def. 56.1 Stat. 9171 ¶ 87; Pl. Opp. at 15 ¶ 87; Chang

Decl. ¶ 10; see Butts v. N.Y.C. Dep't of Hous. Pres. & Dev., 2007 WL 259937, at *10 (S.D.N.Y.

Jan. 29, 2007), aff'd, 307 F. App'x 596 (2d Cir. 2009).

Because none of the evidence would allow a reasonable jury to find that the

Government's articulated reasons for Oluyomi's non-selection were pretextual, the Government

is entitled to summary judgment on Oluyomi's failure to promote claim with regard to the

Adjudications Officer (Policy) position.

   B.   Retaliation and Discrimination

 Oluyomi claims that his one and fourteen-day suspensions were based on discrimination

on account of his race, color, and national origin, and were in retaliation for his prior EEO

activity.  We discuss each of these suspensions separately.

   1.   One-Day Suspension

The Government has provided a legitimate, non-discriminatory reason for Oluyomi's

one-day suspension: namely, that Oluyomi pushed Reyes on the morning of March 13, 2008, and

the complaints from language specialists regarding Oluyomi's conduct toward them and

immigration applicants.  See Def. 56.1 Stat. 10293 ¶¶ 11, 14-15, 17; Pl. Opp. at 19 ¶¶ 11, 14-15,

17.  The decision to suspend Oluyomi was supported by statements written by Reyes, White, and

the two language specialists.  Reyes stated in a memorandum dated March 13, 2008, that

Oluyomi had "pushed [him] out of the way and told [him] to move," noting that White had

witnessed the incident.  See Memorandum from Reyes to Pettway.  White confirmed Reyes's

statement in her own memorandum in which she stated that Oluyomi had "violently pushed"

Reyes.  See Memorandum from White to Troy.  White also noted that after the incident Oluyomi "walk[ed] up to [Reyes] in a very intimidating manner."  Id.  Acebal, a language specialist, described an incident during which Oluyomi "aggressively pressur[ed]" an applicant for citizenship, "became visibly angry" with Acebal while she was interpreting for the applicant, and threatened to have Acebal fired.  See Correa and Acebal Complaints at GOVT450.  Correa, also a language specialist, recounted an incident during which Oluyomi answered a question she had asked in an "extremely rude manner," "yelled" at the applicant for citizenship, and interrupted Correa when she was interpreting for the applicant.  Id. at GOVT451.

Accordingly, we find that the Government has offered a legitimate, non-discriminatory reason for Oluyomi's one-day suspension.  See Gelin v. Snow, 2005 WL 2456742, at *9 (S.D.N.Y. Sept. 30, 2005) (legitimate, non-discriminatory reason for suspension where plaintiff's conduct was perceived as "threatening"), aff'd, 234 F. App'x 5 (2d Cir. 2007); Edwards v. City of New York, 2005 WL 3466009, at *15 (S.D.N.Y. Dec. 19, 2005) ("Insubordinate and unprofessional conduct is a legitimate, non-discriminatory reason for terminating an employee."); Cooney v. Consol. Edison, 220 F. Supp. 2d 241, 252 (S.D.N.Y. 2002) (legitimate, non-discriminatory reason for plaintiff's suspension where plaintiff had "had harassed and/or verbally abused and intimidated a number of co-employees"), aff'd, 63 F. App'x 579 (2d Cir. 2003).  For his part, Oluyomi has failed to demonstrate that this reason provided by the Government was pretextual.

In reaching the decision to suspend Oluyomi, Quarantillo considered the statements of the various witnesses, statements made by supervisors in Oluyomi's chain of command, and Oluyomi's April 24, 2008 denial of the allegations.  See Def. 56.1 Stat. 10293 ¶ 23; Pl. Opp. at 20 ¶ 23; Quarantillo Decl. 10293 ¶¶ 7-9.  Oluyomi disputes the Government's assertion that

Quarantillo found a "preponderance of the evidence" supported the disciplinary action, Def. 56.1 Stat. 10293 ¶ 24; Pl. Opp. at 20 ¶ 24, on the ground that the Government did not provide "feedback" to his April 2008 denial, Pl. Opp. at 20 ¶ 24.  However, he provides no evidence to suggest that the Government had any obligation to respond.

He also asserts that White is not a credible witness because she was aware of his prior EEO activity.  See Pl. Motion at 11; Pl. 56.1 Stat. ¶ 47 (citing Oluyomi Affidavit, dated Jan. 2, 2009 (annexed as Ex. 33 to Pl. Motion) ("Exhibit 33"); Oluyomi Affidavit, dated Jan. 26, 2009 (annexed as Ex. 34 to Pl. Motion) ("Exhibit 34"); Official Response to a Proposal of Disciplinary Action (annexed as Ex. 37 to Pl. Motion) ("Exhibit 37")).  Presumably, Oluyomi contends that her awareness of such activity would give her a motivation to lie about his conduct.  But White's credibility is of minimal importance as there were other witnesses to Oluyomi's improper conduct.  In any event, Oluyomi offers no real evidence even to support the charge that White was aware of Oluyami's prior EEO activity.  The only evidence Oluyami identifies in support of this assertion is three of his own prior written statements in which he either does not mention White, or asserts that White is not credible because she was selected for the Senior Adjudications Officer position and because she "is clearly a favorite of immediate leadership." Exhibit 37 at 118-19; see Pl. 56.1 Stat. ¶ 47 (citing Exhibit 33; Exhibit 34; Exhibit 37 at 118-19); see also Oluyomi Dep. 10293 at 69-70 (Oluyomi concedes he has no information that White knew about his prior EEO activity).

Oluyomi points out that he "was not contacted or notified about any alleged pushing incident until April 4, 2008 – several weeks after the alleged 'violent push' incident."  Pl. 56.1 Stat. ¶ 40 (citing Memorandum from Oluyomi to Taylor, dated Apr. 4, 2008 (annexed as Ex. 38 to Pl. Motion); Oluyomi Affidavit, dated Nov. 5, 2008 (annexed as Ex. 32 to Pl. Motion) at 4).

However, Oluyomi has provided no evidence that DHS officials did not follow appropriate procedures in notifying him of the allegation on April 4.  And even if there had been a delay in seeking Oluyomi's response to the allegation, Oluyomi has failed to connect any such delay to his prior EEO activity.  See Uddin v. City of New York, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) ("[t]here must be more evidence than plaintiff's own speculations" to create an inference of retaliation) (citation omitted).

Oluyomi contends that Ruben's conduct toward him on April 4, 2008 constituted retaliation and that Ruben lied about his involvement in Oluyomi's prior EEO case.  See Pl. 56.1 Stat. ¶ 52; Pl. Mem. at 18-19.  First, neither Bunce's disciplinary proposal to Oluyomi, nor Oluyomi's written response to the proposal, references Oluyomi's April 4 interaction with Ruben, see Sept. 2008 Letter from Bunce to Oluyomi; Exhibit 37, and Oluyomi has offered no evidence that Ruben mentioned Oluyomi's prior EEO activity during the April 4 incident.

Moreover, even assuming Quarantillo considered the incident in making the decision to suspend Oluyomi, there is no evidence that retaliatory animus motivated her decision.  The issue to be proven in a discrimination case is whether there was an improper motive for the employment decision – not whether any conduct relied upon by the employer actually occurred. Thus, an employer "must merely have a good faith belief in the articulated reason for an employee's termination."  Pacenza v. IBM Corp.  2009 WL 890060, at *14 (S.D.N.Y. Apr. 2, 2009), aff'd, 363 F. App'x 128 (2d Cir. 2010); accord McPherson, 457 F.3d at 216 (the court is "decidedly not interested in the truth of the allegations against plaintiff," but is rather interested in what "'motivated the employer'") (emphasis in original) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)); Forrester v. Rauland-Borg Corp., 453 F.3d 416, 417 (7th Cir. 2006) ("[A]s we have said countless times, the question in a discrimination case is

34

not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff

is complaining is correct but whether it is the true ground of the employer's action rather than

being a pretext for a decision based on some other, undisclosed ground.") (citation omitted);

Baur v. Rosenberg, Minc, Falkoff & Wolff, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008)

("[i]n determining pretext, the issue is not whether the employer reached a correct conclusion in

attributing fault with respect to workplace altercations, but whether the employer made a

good-faith business determination."); Argueta v. N. Shore Long Island Health Sys., Inc., 2003

WL 22670915, at *5 (E.D.N.Y. Nov.6, 2003) ("relevant inquiry is not what happened but rather,

what the decisionmakers believed happened") (emphasis in original); Agugliaro v. Brooks Bros.,

Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their

belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their

decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").  Thus,

any dispute as to what actually transpired between Oluyomi and Ruben on April 4, 2008, is not

"material" to the question of whether the Government's reasons for its actions against Oluyomi

were pretextual.[5]

---

[5]  For what it is worth, there is no evidence suggesting that Ruben lied about his involvement in the prior EEO case to "cover-up his retaliatory scheme" against Oluyomi.  Pl. 56.1 Stat. ¶ 52; Pl. Mem. at 18-19.  Oluyomi asserts that Ruben's testimony that he had been uninvolved in the selection process for the Senior Adjudications Officer position, at issue in Case No. 09 Civ. 9171, was "simply untrue."  Exhibit 33 at 2.  However, Oluyomi testified at his deposition that, other than Glen Jupe, he did not know who interviewed the applicants for the Senior Adjudications Officer position.  See November 30, 2010 Oluyomi Deposition in 09 Civ. 10293 (annexed as Ex. 1 to Boeving Second Decl.) at 240-41.  And while Oluyomi claims that Jupe told him that he interviewed with Ruben, this hearsay statement is insufficient to create a triable issue of fact to defeat summary judgment.  Additionally, the undisputed evidence demonstrates that Ruben was not one of the officials who interviewed applicants for the Senior Adjudication Officer position.  See Def. 56.1 Stat. 10293 ¶¶ 39-41; Pl. Opp. at 22 ¶¶ 39-41; Declaration of John T. Ryan, dated Mar. 7, 2011 (annexed as Ex. 3 to Boeving Second Decl.) ¶ 9; Declaration

(continued...)

Because none of the evidence suggests that the Government's articulated reason for Oluyomi's one-day suspension was pretextual, the Government is entitled to summary judgment on Oluyomi's discrimination and retaliation claims with regard to this disciplinary action.[6]

    2.   Fourteen-Day Suspension

The Government has also provided a legitimate, non-discriminatory reason for Oluyomi's fourteen-day suspension: namely, that Oluyomi knowingly ignored the one-day suspension from Quarantillo by showing up to work on August 4, 2008.  Oluyomi admits that he was aware of this disciplinary action, see Oluyomi Dep. 10293 at 216, and that he reported to work in spite of the suspension, intending to engage in his regular work duties, see Def. 56.1 Stat. 10293 ¶ 26; Pl. Opp. at 20 ¶¶ 26-27; Oluyomi Dep. 10293 at 207-09, 215-17.  When Taylor reminded him that he was on suspension and asked that he leave the building, Oluyomi refused.

---

[5] (...continued)
of Enrica Troy, dated Mar. 9, 2011 (annexed as Ex. 4 to Boeving Second Decl.) ¶ 9.

    Moreover, even if, as Oluyomi asserts, Ruben was involved in the selection process for the Senior Adjudications Officer position, Oluyomi does not dispute that it was Bunce who proposed that he be suspended and that it was Quarantillo who ultimately decided to issue the suspension.  See Def. 56.1 Stat. 10293 ¶¶ 20, 22-23; Pl. Opp. at 20 ¶¶ 20, 22-23; Bunce Decl. 10293 ¶ 10; Quarantillo Decl. 10293 ¶¶ 7-9.

[6] Oluyomi complains that Ruben violated his "Weingarten Rights" – referring to the right to the presence of a union representative during an investigatory interview, see N.L.R.B. v. J. Weingarten, Inc., 420 U.S. 251 (1975) – because Oluyomi was not "given the opportunity to request representation" during his interactions with Ruben, Pl. Opp. at 19 ¶ 18; Pl. Mem. at 17-18.  We note that such rights are protected by the National Labor Relations Act, 29 U.S.C. § 157, and exclusive jurisdiction over unfair labor practice claims lies with the National Labor Relations Board, see Voilas v. Gen. Motors Corp., 170 F.3d 367, 378 (3d Cir. 1999); United Auto., Aerospace & Agr. Implement Workers of Am., Local 33 v. R.E. Dietz Co., 996 F.2d 592, 595 (2d Cir. 1993); Richardson v. Kruchko & Fries, 966 F.2d 153, 158 (4th Cir. 1992).  In any event, even if Oluyomi's Weingarten rights were violated, he has not provided any evidence to suggest that such a violation was based on his race, color, national origin, or prior EEO activity.

See Def. 56.1 Stat. 10293 ¶¶ 27-29; Pl. Opp. at 20-21 ¶¶ 27-29; Troy Decl. 10293 ¶ 7; Oluyomi

Dep. 10293 at 221, 223-24; Boeving Decl. 10293 ¶ 9.  In fact, Oluyomi testified that he told

Taylor, "'I'm not going to accept this suspension.'"  Oluyomi Dep. 10293 at 34.  As the FPS

arrived, Troy again asked Oluyomi to leave the building and he again refused.  The FPS then

removed Oluyomi from the building.  See Def. 56.1 Stat. 10293 ¶ 30; Pl. Opp. at 21 ¶ 30; Troy

Decl. 10293 ¶ 7; Oluyomi Dep. 10293 at 83, 225.  Accordingly, the Government has offered a

legitimate, non-discriminatory reason for Oluyomi's fourteen-day suspension.  See, e.g.,

Sotolongo v. N.Y.C. Transit Auth., 216 F.3d 1073 (2d Cir. 2000) (employer had legitimate non-

discriminatory reason for suspension where plaintiff "refused work instructions and issued

threats of violence"); Redd v. N.Y.S. Div. of Parole, 2010 WL 1177452, at *10 (E.D.N.Y. Mar.

2, 2010) (employee had legitimate non-discriminatory reason to suspend plaintiff where plaintiff

failed to follow her supervisor's instructions); Edwards, 2005 WL 3466009, at *15

("Insubordinate and unprofessional conduct is a legitimate, non-discriminatory reason for

terminating an employee.").

Oluyomi has failed to show that the Government's stated reason for issuing this

suspension was a mere pretext for unlawful discrimination or retaliation, as he admits the

conduct underlying the disciplinary action.  See Gibbs v. N.Y.S. Dep't of Taxation and Fin.,

2009 WL 754307, at *7 (E.D.N.Y. Mar. 20, 2009) (no pretext where plaintiff admitted to

engaging in the conduct that gave rise to his suspension).  Oluyomi does not dispute that he

knowingly ignored the one-day suspension by reporting to work on August 4, 2008, and that he

refused orders to leave the building.  See Oluyomi Dep. 10293 at 216; Def. 56.1 Stat. 10293

¶ 26; Pl. Opp. at 20 ¶¶ 26-27; Oluyomi Dep. 10293 at 207-09, 215-17.  And there is no evidence

that the suspension was issued for any reason other than Oluyomi's disregard of the prior

disciplinary action.  Accordingly, the Government is entitled to summary judgment on

Oluyomi's discrimination and retaliation claims with regard to his fourteen-day suspension.

IV.    CONCLUSION

For the foregoing reasons, Oluyomi's motions for summary judgment (Docket # 34 in 09

Civ. 9171) (Docket # 31 in 09 Civ. 10293) are denied and the Government's motions (Docket

# 36 in 09 Civ. 9171) (Docket # 32 in 09 Civ. 10293) are granted.  The Clerk is requested to

enter judgment dismissing both cases.

Dated: September 19, 2011
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Alaba Oluyomi
43 Colonial Lake Dr.
Lawrenceville, NJ 08648

James Nicholas Boeving
U.S. Attorney Office
86 Chambers Street
New York, NY 10007